1

2

Honorable Richard A. Jones

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9

GETTY IMAGES, INC., a Delaware
Corporation,

10

Case No. 2:16-cv-1892

11

        Plaintiff,

PLAINTIFF'S REPLY IN SUPPORT OF
PRELIMINARY INJUNCTION

12

 vs.

13

ROXANNE MOTAMEDI, an individual,

14

        Defendant.

15

## I.   INTRODUCTION

16

What a tangled web Defendant and her co-conspirators have woven.  When GETTY IMAGES

17

filed its Motion for Temporary Restraining Order, To Show Cause, For Expedited Discovery, and

18

Letter of Request ("TRO") (Dkt. 2) they had but scratched the surface in uncovering Motamedi's

19

deception.  In the span of hours preceding filing this reply, GETTY IMAGES has been deluged with a

20

tsunami of evidence that Ms. Motamedi disgorged after being compelled to do so by this Court's

21

Order.  That evidence consists of more than 25,000 documents spanning more than 80,000 pages

22

(made available for inspection on January 7 and January 8), and Motamedi's testimony during her

23

Court-Ordered deposition earlier today.  Declaration of Tina Aiken ("Aiken Dec."), ¶ 2.  Among other

24

things, that evidence shows:

25

26

- Motamedi was conspiring with Nick Evans-Lombe to undermine GETTY IMAGES's business, take customers, employees and photographers, and utilize GETTY IMAGES's resources for their own benefit, starting in 2015 and throughout 2016, despite her position as a Vice President of GETTY IMAGES.

27

28

PLAINTIFF'S REPLY REGARDING PRELIMINARY
INJUNCTION - 1

- Motamedi has stolen significant trade secrets and confidential information and has unsuccessfully attempted to cover her tracks.

- Motamedi has attempted to delete evidence of her misappropriation, leaving GETTY IMAGES and this Court to infer that she has copied/transferred/ forwarded/shared/stored GETTY IMAGES's trade secrets for future use.

- Motamedi interfered with GETTY IMAGES's relationships with its clients, photographers, and employees while still employed, in breach of her fiduciary duties, and accelerated those efforts after her last day of employment; she will continue to do so unless restrained.

- Motamedi and/or her persons acting on her behalf used stolen GETTY IMAGES documents to create forms for use in competition with GETTY IMAGES, including, ironically, her own employment contract with SilverHub.

- Motamedi's word is worthless.  She cannot be trusted not to use GETTY IMAGES's data or documents that are still in her possession, notwithstanding a Court Order prohibiting her from doing so.

For the reasons that follow, a preliminary injunction should be entered continuing the restraints imposed by paragraphs 12-16 of the Court's TRO Order.  (Dkt. 20).  Further, Motamedi should be immediately ordered to deliver all devices used by her or her husband on her behalf to the third-party expert utilized previously by the parties, and provide access to her cloud-based storage accounts so that they can be wiped clean of all contact information, emails, contracts, spreadsheets, analyses, strategic reports, or other data obtained from GETTY IMAGES.

## II.  ARGUMENT

### A.    Motamedi's Opposition is Unsupported by Evidence

Noticeably absent from Motamedi's opposition is any declaration from Motamedi, her husband, or Evans-Lombe denying GETTY IMAGES's allegations of misconduct or attempting to explain her malfeasance – despite the fact that almost immediately after receiving notice from GETTY IMAGES that it planned to file suit, she used her husband's cell phone to send an "Urgent" email message to Evans-Lombe, as follows:

> Nick,
> Please call Mitchell cell.
> I am being sued by Getty.
> It is bad.  Call this cell as soon as you wake up.  Even if it is the middle of night.

PLAINTIFF'S REPLY REGARDING PRELIMINARY
INJUNCTION - 2

*See* Aiken Decl., Ex. 9 (Motamedi Dep."), Ex. 2. [1]

Instead of evidence, Motamedi's opposition is limited to a series of half-hearted legal arguments based on irrelevant/inapposite case law.  Contrary to those arguments, GETTY IMAGES is not "attempt[ing] to create out of whole cloth" a non-compete agreement.  Its claims are based on her statutory violations, tortious conduct, and egregious violations of her Non-Disclosure Agreement.  As a corporate officer, Motamedi was duty-bound until the date of her resignation to act in GETTY IMAGES's best interests.  Pre- and post-resignation, she was, and continues to be, contractually-bound by her Non-Disclosure Agreement.  She is further legally-bound not to disclose GETTY IMAGES's trade secrets.  Under Washington law,

> [A] former employee, *even in the absence of an enforceable covenant not to compete*, remains under a duty not to use or disclose, to the detriment of the former employer, trade secrets acquired in the course of previous employment.  Where the former employee seeks to use trade secrets of the former employer in order to obtain a competitive advantage, *then competitive activity can be enjoined* or result in an award of damages.

*Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wn.2d 427, 437, 971 P.2d 936 (1999) (emphasis added).

*See also* Economic Espionage Act, as amended by the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3) ("EEA").

**B.    GETTY IMAGES's Evidence is Uncontested**

The following facts in GETTY IMAGES's opening brief are uncontested and therefore deemed admitted:

- Motamedi met with Evans-Lombe in as early as March 2015 and began communicating at that time regarding the development of a business to compete with GETTY IMAGES.

- Motamedi began forwarding GETTY IMAGES's business strategy regarding the company's editorial workflow; strategy regarding new market targets, new product areas, and the compensation information for key GETTY IMAGES's employees to Evans-Lombe at least as early as December 2015 and through March 2016 during her employment with GETTY IMAGES.

- Motamedi discussed with Evans-Lombe potential clients, partners and competitors to SilverHub in April 2016—*a few days prior to the launch of SilverHub.*

---

[1] The documents produced by Motamedi show that between her and her husband, more than 56 calls, text messages and emails were made/exchanged between 5:00PM on December 11, 2016 (when GETTY IMAGES's counsel first emailed her notice that it intended to file suit and seek a TRO) and 3:00PM on December 12, 2016, between the co-conspirators.  *See* Aiken Decl., Ex. 1 and 2.

PLAINTIFF'S REPLY REGARDING PRELIMINARY
INJUNCTION - 3

SEBRIS BUSTO JAMES
14205 S.E. 36th Street, Suite 325
Bellevue, Washington  98006
Tel: (425) 454-4233 – Fax:(425) 453-9005

- Motamedi forwarded an analysis of High Value Partners and contributors; a revenue report for all GETTY IMAGES's entertainment photographers; and dozens of the company's highly negotiated agreements with the company's key contributors, partners and customers to her personal email account and to her husband's email account in the last several weeks of her employment with GETTY IMAGES and directed her subordinates to provide her with such information.

- Motamedi diverted a significant business opportunity by delaying her team from closing a lucrative deal in the luxury brand space in Italy with one of the company's competitors.

*See* Local Rules W.D. Wash. LCR 7(b)(2); *see also Bds. of Trs. of the Cement Masons & Plasterers Health & Welfare Trust v. Concreteman, Inc.*, C13-1698JLR, 2014 U.S. Dist. LEXIS 65253, at *9 (W.D. Wash. May 12, 2014) ("Failure to respond to an argument may be treated as an admission that the argument has merit.").

Motamedi does not contest these facts because she cannot. Expedited discovery has only confirmed that the activities of her and her husband to undermine GETTY IMAGES and misappropriate its trade secrets, business opportunities, and relationships went far beyond anything what was evidenced on GETTY IMAGES's own systems. *See* 2nd Declaration of Craig Peters ("2nd Peters Decl.") and exhibits thereto. Expedited discovery shows beyond a shadow of a doubt that these activities are likely to continue unabated unless Motamedi and all persons acting on her behalf are enjoined. Finally, expedited discovery revealed that the most powerful motivator of all – greed – is driving Motamedi: she has been paid $33,320.00 from SilverHub for services rendered to it in November and December, and was offered an Employment Agreement that would pay her a base salary of $350,000 annually, an annual bonus of $150,000, and a 10.5% equity interest in SilverHub. Motamedi Dep., Ex. 5 (pp. 1-2).

**C. Motamedi's Deposition Testimony Supports Injunctive Relief**

Earlier today, Motamedi provided sworn testimony. A highlighted copy of the deposition transcript is being filed with this reply brief. *See* Aiken Decl., Ex. 9. Based on Motamedi's testimony, she knows nothing, and can remember nothing, about her activities at any time. A quick review of the transcript reveals that Motamedi is not being honest about her activities and is continuing to try to cover the scope of her misconduct. But more importantly, Motamedi does not deny, and by

PLAINTIFF'S REPLY REGARDING PRELIMINARY
INJUNCTION - 4

SEBRIS BUSTO JAMES
14205 S.E. 36th Street, Suite 325
Bellevue, Washington  98006
Tel: (425) 454-4233 – Fax:(425) 453-9005

1   implication admits, her egregious breach of her duty of loyalty and her breach of her Non-Disclosure

2   Agreement and Getty's Code of Conduct and Code of Ethics.

3   **D.      Getty Images Will Succeed on the Merits on All of its Claims.**

4       Motamedi's opposition conflates the analyses for irreparable harm, balance of hardships, and

5   public policy.  She fails to address GETTY IMAGES's likelihood of success on the merits in depth,

6   and ignores the foundation of GETTY IMAGES's claims for breach of her duty of loyalty, breach of

7   her Non-Disclosure Agreement, and her misappropriation of trade secrets.

8       **1.      Motamedi Breached her Duty of Loyalty.**

9       As a corporate officer in her role as a Vice President, Motamedi was duty-bound until her

10  resignation date—November 7, 2016—to "act in the best interests of the corporation—'a standard of

11  behavior above that of the workaday world.'"  *See Lodis v. Corbis Holdings, Inc.*, 172 Wn. App. 835,

12  860, 292 P.3d 779 (2013).  The evidence presented in the accompanying declarations, as well as the

13  evidence presented in the initial and second declaration of Craig Peters, establishes without any doubt

14  that Motamedi egregiously breached her duty of loyalty, by soliciting photographers, customers, and

15  employees on behalf of SilverHub, a competitor, *during her employment with Getty Images*.  *See* 2nd

16  Peters Decl.  *See, e.g., Western Med. Consultants, Inc. v. Johnson*, 80 F.3d 1331, 1337-38 (9th Cir.

17  1996) ("[A]n employee may make arrangements to compete with her employer before termination,

18  'except that she cannot properly use confidential information peculiar to her employer's business and

19  acquired therein.'") (quoting RESTATEMENT (SECOND) OF AGENCY § 393, comment e); *Kieburtz v.*

20  *Rehn*, 68 Wn. App. 260, 265, 842 P.2d 985 (1992) ("During the period of his or her employment, an

21  employee is not 'entitled to solicit customers for [a] rival business …' or to act in direct competition

22  with his or her employer's business."); *Blackbird Techs.*, 2015 U.S. Dist. LEXIS 136505 at *18-20

23  (granting preliminary injunction founded on breach of duty of loyalty claim; no reason to permit

24  former employee to cause injury and continue to profit from probable breach of duty of loyalty).

25      **2.      Motamedi Breached Her Non-Disclosure Agreement**

26      Motamedi contractually-bound herself to "hold Getty Images Confidential Information in strict

27  confidence, not to disclose such Confidential Information to third parties or to any person; and not to

28  use any Confidential Information for any purpose except for the Business Purpose."  Dkt. #8 (Hatcher

PLAINTIFF'S REPLY REGARDING PRELIMINARY
INJUNCTION - 5

Decl. ¶ 1) (Non-Disclosure Agreement).  Motamedi does not deny she possesses GETTY IMAGES's information regarding its contributors, partners, customers and business prospects.  In fact, she produced over 25,000 responsive documents (which equates to more than 80,000 pages) during expedited discovery.  Aiken Decl., ¶ 2.  She instead contends "[t]he files at issue may well contain documents that Motamedi has been specifically permitted by her agreements with GETTY IMAGES to retain after leaving employment."  Dkt. #25 at p. 13.  This argument is rubbish; there are no such mythical agreements.  If they existed, it was incumbent on Motamedi to identify them.  The only "agreements" are the Non-Disclosure Agreement and GETTY IMAGES's Code of Conduct and Code of Ethics, all of which Motamedi has violated.

If Motamedi's opposition is lacking, her response to the expedited discovery requests is just as bad.  For example, she stated under penalty of perjury, "Defendant "*may have*" accessed Plaintiff's computers, computer systems, cell phones, cloud-based storage accounts, other data-storage devices or any other information from October 15, 2016 to November 7, 2016."  Aiken Dec., ¶ 8 [Defendant's Response to Interrogatory No. 12.] (emphasis added).  The only explanation for this qualified admission is that Defendant does not know the extent of what GETTY IMAGES knows about her actions.

As shown by the accompanying declarations, Motamedi accessed GETTY IMAGES's systems repeatedly during the cited time period, sent herself (and her husband) hundreds of emails containing highly sensitive data and documents through which she hoped to gain a competitive advantage for SilverHub and then she tried to delete them to cover her tracks.  *See* Declaration of Lizanne Elizabeth Vaughan, and exhibits thereto; *see also* Aiken Decl., Ex. 1 (Column labeled "Deleted" showing that Motamedi deleted (or attempted to delete) **more than 200 messages** before turning in her phone to be imaged).  Such conduct indisputably violated her Non-Disclosure Agreement, as well as GETTY IMAGES's Code of Conduct, Code of Ethics and Leadership Principles, as described in the Declaration of Dawn Airey.

PLAINTIFF'S REPLY REGARDING PRELIMINARY
INJUNCTION - 6

SEBRIS BUSTO JAMES
14205 S.E. 36th Street, Suite 325
Bellevue, Washington  98006
Tel: (425) 454-4233 – Fax:(425) 453-9005

### 3. Motamedi Violated Washington's UTSA.

Motamedi does not even try to establish GETTY IMAGES's detailed information about its current and prospective clients, pending projects, finances, key employees, pricing, designs, and other elements of its business that she shared with Nick Evans-Lombe, SilverHub and her husband do not constitute trade secrets under the Washington Uniform Trade Secret Act. Her sole contention is that "Getty Images has made no showing that any of [the documents forwarded to personal emails accounts of her, her husband, and the founder of SilverHub] constituted trade secrets." She does not provide any supporting arguments.[2]

Motamedi's production has clearly demonstrated that the information and documents that she stole had independent economic value to a competitor; SilverHub has shown that as well. That information/documents was worth paying more than $33,000 for in November and December. *See* Aiken Decl., Ex. 8 (Response to Interrogatory No. 2); *cf.* Motamedi Dep., p. 53:23-25. SilverHub and Motamedi have already converted GETTY IMAGES' contracts and contributor agreements for their own purposes. Declaration of Jon Ames ("Ames Decl."), ¶ 2. They have actively called on clients, photographers, and employees to whom they had no prior access using trade secret information obtained from GETTY IMAGES. 2nd Peters Declaration. They have used GETTY IMAGES's trade secrets regarding its business strategy to plan their competing business strategy. *See, e.g.,* 2nd Peters Decl.

### 4. Motamedi Violated the EEA.

The EEA defines trade secrets similarly to but even more broadly than the UTSA. *See* 18 U.S.C. § 1839(3). Under the EEA, the Court may grant an injunction to prevent actual or threatened misappropriation of trade secrets. 18 U.S.C. §1836(b)(3); *Henry Schein, Inc. v. Cook*, 2016 U.S. Dist. LEXIS 81369 at *17 (N.D. Cal. June 22, 2016). As in *Cook*, GETTY IMAGES has shown a likelihood of succeeding on the merits under the EEA.

---

[2] In her deposition she testified that her husband had no relationship with her activities or SilverHub, and had no explanation for why he would be communicating with Evans-Lombe or SilverHub.

SEBRIS BUSTO JAMES
14205 S.E. 36th Street, Suite 325
Bellevue, Washington  98006
Tel: (425) 454-4233 – Fax:(425) 453-9005

**E.     Getty Images Will Suffer Irreparable Harm.**

Motamedi's breach of her duty of loyalty, breach of her Non-Disclosure Agreement, and the misappropriation of GETTY IMAGES's trade secrets has caused, and will continue to cause, irreparable harm in the form of (1) lost business or business opportunities, lost customers, as well as damage to good will and (2) Motamedi's head start advantage, based on her breach of duty of loyalty, breach of her Non-Disclosure Agreement, and trade secret misappropriation.

**1.     Getty Images Has Lost, and Will Continue to Lose, Business and Employees.**

Evidence of lost business or business opportunities, as well as damages to goodwill, will satisfy the requirement to show irreparable harm.  *See, e.g.*, *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("[W]e have also recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm."); *see also UBS Fin. Servs. v. Hergert*, 2013 U.S. Dist. LEXIS 147016, at *5 (W.D. Wash. Oct. 10, 2013) (Jones, J.) ("If [plaintiff] were to lose a client because of [defendant]'s misappropriation of that trade secret, it would suffer irreparable harm.").

As a result of Motamedi's conduct, GETTY IMAGES has lost at least five employees, two highly successful photographers (and knows of at least several more that have been targeted by SilverHub), has lost multi-year contracts, and has seen relationships with long-time significant accounts threatened.  2nd Peters Decl.  In addition, to these concrete examples of actual harm, GETTY IMAGES's Non-Disclosure Agreement states that "the unauthorized disclosure or use of such Confidential Information would cause irreparable harm and significant injury, the degree of which may be difficult to ascertain," and gives GETTY IMAGES "the right to obtain an immediate injunction from any court of-competent jurisdiction enjoining breach of this Agreement and/or disclosure of the Confidential Information."  *See* Dkt. ##8, 8.1 (Hatcher Decl. ¶5, Ex. 1, para. 8) (Non-Disclosure Agreement); *see also Riverside Publ. Co. v. Mercer Publ. LLC*, 2011 U.S. Dist. LEXIS 85853, at *22 (W.D. Wash. Aug. 4, 2011) (although irreparable harm clause alone is not sufficient to establish

PLAINTIFF'S REPLY REGARDING PRELIMINARY
INJUNCTION - 8

SEBRIS BUSTO JAMES
14205 S.E. 36th Street, Suite 325
Bellevue, Washington  98006
Tel: (425) 454-4233 – Fax:(425) 453-9005

injunctive relief, the prediction that a breach of agreement would be of the sort that would cause irreparable harm "is perhaps entitled some weight").

"Irreparable harm is a likely consequence of permitting an employee to pursue [her] former customers in violation of a valid restriction." *Amazon v. Powers*, C12-01911RAJ, 2012 U.S. Dist. LEXIS 182831, at *35 (W.D. Wash. Dec. 12, 2012). "The monetary damages from loss of a customer is difficult to quantify, and the damage to goodwill even more so." *Id.* The valid restriction in *Amazon* was a non-competition agreement but the same principles apply with particular force here. Motamedi's breach of her non-disclosure agreement has caused, and continues to cause, harm to GETTY IMAGES because she is using GETTY IMAGES's confidential information on behalf of a direct competitor, SilverHub, to solicit GETTY IMAGES's contributors, partners, customers, employees, and business prospects. Loss of these types of relationships means the loss of an unknown number of future business opportunities.

Likewise, "[i]n the context of a motion for preliminary injunctive relief, an intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." *Pac. Aero. & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. Jun. 20 2003). Here, Motamedi's implausible denial of any activity on behalf of SilverHub, or any explanation whatsoever for why she sent herself hundreds of highly sensitive documents, much less why she shared highly sensitive strategic information with Evans-Lombe while a Vice President of GETTY IMAGES, suggests the worst-case scenario is the most probable scenario. Despite her claimed ignorance, Motamedi's document production shows that SilverHub is currently using documents purloined from GETTY IMAGES to run its business. Ames Decl., ¶¶ 2-3; Motamedi Dep., Ex. 5.

## F.   The Balance of Hardships Tips in Favor of GETTY IMAGES

Motamedi's balance of hardship argument appears to rest on the incorrect premise that the relationships she developed during her employment with GETTY IMAGES's are *hers*. *See* Dkt. #25 at p. 7 ("As Motamedi's profession is highly relationship based, such an injunction would bear a significant risk of rendering her permanently unemployable."). She is mistaken.

SEBRIS BUSTO JAMES
14205 S.E. 36th Street, Suite 325
Bellevue, Washington  98006
Tel: (425) 454-4233 – Fax:(425) 453-9005

Motamedi was highly compensated to develop those relationships *for* GETTY IMAGES. "It is elementary that what is done by the agent in the course of his employment is, in the legal sense, done by the master himself." *John Davis & Co. v. Miller*, 104 Wash. 444, 448, 177 P. 323 (1918). The Washington Supreme Court addressed the very argument raised by Motamedi in *Davis*. There, the issue was "whether [defendant] ha[d] a right to solicit the customers of [plaintiff] to leave that company and transfer their business to him, using as a reason therefore his personal acquaintance with them which he acquired while employed by [plaintiff] and the fact that he there looked after or managed their business." *Id.* at 447. The court said he had no such right; the customer relationships belonged to the employer. *Id.* "Running through the cases will be repeatedly found the statement that where an employee, after severing his connection with his former employer, makes use of trade secrets or confidential information, which he acquired during his employment, in a competitive business, it results in what is called 'unfair competition,' and will be restrained." *Id.* at 448.

> In the present case, [defendant] used what he had gained while in the employment of appellant to take away its customers and asserted that he would continue to do so in the future unless restrained. The business of his former employer had been built up through many years by the practice of industry, expenditure of money, and the exercise of judgment. It certainly would be unfair competition for [defendant] after leaving the employment to use his acquaintance with the customers of that company there acquired and the knowledge of the business which he there transacted, as a reason why such customers should transfer their business to him or his company. In our opinion the trial court erred in granting the nonsuit.

*Id.*, at 449-50; *see also J.L. Cooper & Company v. Anchor Securities Company*, 9 Wn.2d 45, 64, 113 P.2d 845 (1941) and authorities cited therein ("The weight of authority is to the effect that a former employee may be restrained from using for competitive solicitation a list of customers of his former employer; that an employee may not carry away confidential information by copies or in his head and solicit names thus remembered; *Nowogroski*, 137 Wn.2d at 444 (citing *Davis* and *Cooper*).

In sum, Motamedi is free to go into the marketplace to develop *new* relationships; she is not free to exploit the relationships she developed while on GETTY IMAGES's payroll.[3] She is absolutely not free to do so using GETTY IMAGES's own competitively sensitive information (Ames Dec. ¶¶ 2-3); or after having sent out gifts paid for by GETTY IMAGES, to open doors with those clients. *See*

---

[3] Motamedi seems to have acknowledged as much in her deposition. *See* Motamedi Dep., p. 69:18-19.

PLAINTIFF'S REPLY REGARDING PRELIMINARY
INJUNCTION - 10

1    Declaration of Dawn Airey ("Airey Dec."), ¶ 17 and exhibits thereto.  Accordingly, restraining her from

2    doing so cannot legally constitute a hardship to her.  *See Cadence Design Sys., Inc. v. Avant! Corp.*, 125

3    F.3d 824, 830 (9th Cir. 1997) ("[W]here the only hardship defendant will suffer is lost profits from an

4    activity which has been shown likely to be infringing, such an argument in defense merits little equitable

5    consideration."); *see also Dish Network L.L.C. v. Ramirez*, 2016 U.S. Dist. LEXIS 72317, at *19 (N.D.

6    Cal. June 2, 2016) (balance of hardships tips in favor of plaintiff seeking injunction when it would "do

7    no more than require Defendant to comply with federal and state … laws").

8         Under the proposed preliminary injunction, Motamedi can continue to engage in her line of

9    business but will be restricted from working with SilverHub or other competitors and contributors,

10   partners, customers and business prospects with whom she dealt with on behalf of GETTY IMAGES.

11   She can directly compete with GETTY IMAGES through the development of *new* relationships in the

12   entertainment industry, as long has she does not use or disclose GETTY IMAGES's trade secrets or

13   confidential information, including information that she has memorized.  She can recruit *new* employees

14   to work with her so long as she does not attempt to use information obtained from GETTY IMAGES to

15   solicit its employees.  In short, when the certainty of irreparable harm to GETTY IMAGES, is weighed

16   against the absence of hardship to Motamedi if the requested relief is granted, the balance tips largely in

17   GETTY IMAGES's favor.

18   **G.    Public Policy Supports GETTY IMAGES**

19         According to the unmistakable terms of the UTSA and EEA, public policy favors the granting of

20   injunctive relief.  The EEA establishes criminal penalties for misappropriation of trade secrets.  18

21   U.S.C. § 1832.  In doing so, the law demonstrates Congress's belief that such conduct is harmful not

22   only to the individual or entity whose secrets are purloined, but also to the public.  Theft of trade secrets,

23   and allowing the thieves to retain and use the confidential information they purloined, undermines

24   business development and stability; preventing such conduct is in the public's interest.  That injunctive

25   relief is generally appropriate when trade secrets have been misappropriated is acknowledged by the

26   inclusion of specific provisions for such relief in both the EEA and the UTSA.

27

28

PLAINTIFF'S REPLY REGARDING PRELIMINARY
INJUNCTION - 11

**H.      The Requested Relief is Appropriately Fashioned to GETTY IMAGES's Harm.**

GETTY IMAGES requests preliminary injunctive relief to help remedy the specific irreparable harms at issue.  "A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction."  *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). "Preliminary relief may take two forms: it may be prohibitory or mandatory in nature."  *Cook* at *8, citing *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009). Contrary to Motamedi's inapposite arguments about specific performance, this Court *can* order a party to take action as part of a mandatory injunction.  *Id.*, at 879; 18 U.S.C.S. § 1836(b)(3)(A)(ii) ("a court may grant . . . an injunction . . .if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret"); RCW 19.108.020(3) ("In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order.") *but see Martin v. Int'l Olympic Committee,* 740 F.2d 670, 675 (9th Cir. 1984) (courts should be extremely cautious about issuing a mandatory injunction because it does more than preserve status quo).

The relief requested by GETTY IMAGES in paragraphs 12-16 of the TRO Order is narrowly tailored to preserve the status quo.  Indeed, it was uncontroversial at the time the Order was under consideration, and since then, the evidence of Motamedi's misappropriation and breach of her duties and obligations has multiplied ten-fold.

The only relief GETTY IMAGES seeks that is a "mandatory injunction" or "an affirmative act" is an order requiring Motamedi and her husband to turn over all devices used by them so that they can be wiped clean of GETTY IMAGES's documents and data.  The inconvenience to them can be minimized through the specific details of the preliminary injunction.  The Court should not rely on Motamedi's promise that she will not use or disclose GETTY IMAGES's trade secrets or confidential information during the pendency of this matter.  Motamedi made – and broke - the same promise to GETTY IMAGES.

DATED this 9th day of January, 2017.

SEBRIS BUSTO JAMES

/s/ Jeff James
Jeffrey A. James, WSBA #18277

PLAINTIFF'S REPLY REGARDING PRELIMINARY
INJUNCTION - 12

1

2

/s/ Tina Aiken
Tina Aiken, WSBA #27792
14205 S.E. 36th Street, Suite 325
Bellevue, Washington 98006
Emails: jaj@sebrisbusto.com
taiken@sebrisbusto.com
Attorneys for Plaintiff

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S REPLY REGARDING PRELIMINARY
INJUNCTION - 13